# Supreme Court of Kentucky

2018-SC-0451-DG

LAURA R. NORMANDIN                                                APPELLANT


|   | ON REVIEW FROM COURT OF APPEALS |
|---|---|
| V. | NO. 2016-CA-0392 |
|   | OLDHAM CIRCUIT COURT NO. 13-CI-00741 |


SCOTT W. NORMANDIN                                                 APPELLEE


## ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION


The Court hereby orders that the Opinion of the Court, rendered December 17, 2020, be MODIFIED, and the attached opinion is hereby ordered substituted for the opinion originally rendered. Additionally, Appellee's Petition for Rehearing is denied.

Minton, C.J.; Conley, Hughes, Keller, Lambert, and VanMeter, JJ., sitting. Nickell, J., not sitting. All concur.


ENTERED: APRIL 29, 2021.


_____
CHIEF JUSTICE

MODIFIED: APRIL 29, 2021
RENDERED: DECEMBER 17, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-0451-DG

LAURA R. NORMANDIN                                        APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                            NO. 2016-CA-0392
OLDHAM CIRCUIT COURT NO. 13-CI-00741

SCOTT W. NORMANDIN                                        APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

Laura R. Normandin (Laura) appeals from an order entered by the Oldham Circuit Court, Family Division, on February 2, 2016, and subsequent denial of her motion to alter, amend, or vacate the order entered on March 21, 2016. Specifically, she appeals the Family Court's classification and division of marital property, calculation of maintenance, and calculation of child support. The Court of Appeals affirmed the decision of the Oldham Family Court in whole. Having reviewed the record and considered the arguments of the parties, we hereby affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

This case stems from Laura's dissolution of marriage action against Scott W. Normandin (Scott). The parties were married in Madison County, Virginia, on January 25, 2004. The marriage resulted in the birth of four children who are still minors. In November 2013, Laura filed for dissolution. The parties attempted to reconcile for approximately a year, before moving forward with the divorce proceedings that ultimately culminated in a trial on January 6, 2016. The Oldham Family Court issued its findings of fact and conclusions of law on February 2, 2016.

Prior to and immediately after their marriage, Laura worked as a commercial real estate manager in Washington, D.C. Following the birth of their first child in 2005, Laura focused on responsibilities as a stay-at-home mother and homemaker. From that point until the time of divorce, Laura had no substantial source of income outside of marital funds with the exception of her receipt of approximately $450,000 from her father's estate while the divorce proceedings were ongoing in the trial court below.

Scott was the sole income earner for the family after Laura left the workforce. At the time of the divorce proceeding he was employed by Humana as the Chief Security Officer with a base salary of $226,096 per year. In this position, he was also the recipient of regular bonuses and incentive-based income, including restricted stock units (RSUs). Classification of Scott's RSUs is the primary issue before the Court. The Humana RSUs were usually granted annually, at Humana's discretion, and vested to the employee after three years.

2

Prior to vesting, the RSUs were subject to restrictions, unavailable to the employee, and non-transferrable until such restrictions lapsed and vesting occurred. The primary restriction was that if Scott was no longer employed by Humana on the date of vesting, any RSUs would be forfeited with only limited exceptions (retirement, disability, or death) which are not applicable to Scott.

The RSUs represented a significant portion of the couple's marital income. In fact, Scott admitted that his 2013 grant of RSUs was due to vest shortly after the conclusion of the trial and would result in a payment of approximately $220,000. In addition to the 2013 grant of RSUs, Scott had similar grants in 2014 (vesting in 2017) and 2015 (vesting in 2018). However, at the time of the trial, Humana was in discussions with Aetna regarding a merger, clouding Scott's job outlook due to likely restructuring. This merger was never consummated.

In addition to the RSUs, the parties contested the classification and equitable distribution of two other pieces of property: Scott's 401k and a plot of unimproved land in Wyoming. The 401k was valued at $499,879. At issue was the portion of the 401k deemed Scott's nonmarital property. The account consisted of funds derived from Scott's employment at Humana during the marriage, Honeywell both prior to and during the marriage, and the Secret Service and British Aerospace prior to the marriage. At trial, Scott testified to rolling his retirement funds from his premarital employment into the Humana account in 2009, claiming $77,000 as the present nonmarital value of the

account. Laura argued that Scott did not sufficiently prove any nonmarital interest in the 401k.

The unimproved Wyoming property was purchased prior to the parties' marriage. Laura stated she paid the initial down payment of $5,000 for the property when they purchased it. Scott testified that although Laura made the down payment, he reimbursed her for it thereafter. They both argued that based on their payment of the down payment, a portion of the property should have been classified as their individual nonmarital property. Neither party provided documentation to support their testimony.

The family court in its February 2, 2016, order found all proceeds from Scott's unvested RSUs were his nonmarital property and did not include them in his income when calculating maintenance or child support. It accepted Scott's $77,000 estimate of the value of his nonmarital portion of his 401k. It found neither party proved by clear and convincing evidence a nonmarital interest in the Wyoming property, deeming it all marital and dividing its value equally.

In determining maintenance, the trial court found Laura's reasonable needs to be $6,000 per month. After considering the nonmarital inheritance, her portion of the marital property awarded, and her ability to become employed, the trial court awarded her maintenance of $1,500 per month for forty-eight months. The trial court granted joint custody, identifying Laura as the primary residential parent, with Scott having custody every other weekend and Wednesdays after school. Turning to child support, the trial court found

4

the couple's monthly adjusted income was above the statutory guideline ceiling of $15,000. Applying the top of the guidelines and declining to adjust upward from that standard resulted in a support award of $2,199.60 per month paid by Scott to Laura.[1]

Following the decree, both parties filed motions to alter, amend, or vacate and motions for additional findings of fact. Those motions were denied by the trial court in a second order on March 21, 2016. Laura appealed that order to the Court of Appeals, disputing the classification of the RSUs, the retirement account, and the Wyoming property, as well as the calculation of maintenance and child support, and the denial of attorney's fees.

The Court of Appeals affirmed the Oldham Family Court in full. The Court of Appeals held that the RSUs were Scott's separate property relying principally on *Sharber v. Sharber*, 35 S.W.3d 841 (Ky. App. 2001), and *Gallagher v. Gallagher*, 2012-CA-00671-MR, 2013 WL 5886028 (Ky. App. November 1, 2013). The Court of Appeals held that the trial court's classification and division of the 401k was supported by substantial evidence and that the trial court properly found neither party met the burden of proving a nonmarital interest in the Wyoming property. As to maintenance and child support, the Court of Appeals held that under an abuse of discretion standard the trial court did not abuse its discretion in awarding $1,500 per month

---

[1] In addition to the child support ordered to Laura, Scott was under an order for child support in the amount of $680 to a prior born child and also to maintain the children on his health insurance policy.

maintenance or in its decision to deny an upward adjustment from the child support guidelines. Laura now appeals the Court of Appeals' decision with respect to the classification of the RSUs, the 401k, and the Wyoming property, as well as the calculation of maintenance and child support.

## II. STANDARD OF REVIEW

The conclusion of whether property is marital or nonmarital is reviewed under a two-part inquiry in which the factual findings made by the court are reviewed under the clearly erroneous standard and the ultimate legal conclusion denominating the item as marital or nonmarital is reviewed de novo.[2] KRS[3] 403.190 states that "all property acquired by either spouse after the marriage and before the decree of legal separation is presumed to be marital property," a presumption that may be rebutted by showing the acquisition was via a means excepted by the statute. The trial court's specific findings of fact as to the acquisition of the property are viewed under a clearly erroneous standard while its conclusions of law applying those facts are reviewed de novo.[4] Lastly, equitable division of marital property need not be equal, rather only "in just proportions," and we will not disturb the trial court's equitable division unless the trial court has abused its discretion.[5]

---

[2] *Smith v. Smith*, 235 S.W.3d 1, 6 (Ky. App. 2006); *see also Holman v. Holman*, 84 S.W.3d 903, 905 (Ky. 2002) (The trial court's classification of property is a statutory conclusion of law which we review de novo.).

[3] Kentucky Revised Statute.

[4] *Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016).

[5] *Smith*, 235 S.W.3d at 6.

The standard of review for determinations of maintenance and child support is an abuse of discretion.[6] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[7] An appellate court will not disturb the holdings or substitute its own judgment when the evidence supports the trial court's decision and it did not abuse its discretion when deciding the case.[8]

## III. ANALYSIS

**A. The trial court improperly classified the restricted stock units as entirely nonmarital property.**

This Court has never directly addressed the marital division of RSUs. The Court of Appeals, when considering this issue, has classified them inconsistently.[9] Kentucky statutes are deceptively simple in classifying property as marital or nonmarital. KRS 403.190(3) states that:

> [a]ll property acquired by either spouse **after the marriage** and **before a decree of legal separation** is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property.

---

[6] *Stipp v. St. Charles*, 291 S.W.3d 720, 727 (Ky. App. 2009) (reviewing maintenance); *Downing v. Downing*, 45 S.W.3d 449, 454 (Ky. App. 2001) (reviewing child support).

[7] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

[8] *Combs v. Combs*, 787 S.W.2d 260, 262 (Ky. 1990).

[9] *See Gallagher v. Gallagher*, No. 2012-CA-00671-MR, 2013 WL 5886028, *11-12 (Ky. App. November 1, 2013) (holding the Defendant's UPS RSUs were too speculative to be included in the marital estate.); *but see Penner v. Penner*, 411 S.W.3d 775, 781 (Ky. App. 2013) (unvested RSUs may represent marital property, income to RSU recipient, or proportional income to each party at vesting).

7

(Emphasis added). This Court has broadly defined property in this context as referring "to a determinate thing or an interest in a determinate thing."[10] The statute goes on to state the party seeking to rebut the presumption has the burden to show the property meets one of the exceptions specified in KRS 403.190(2).[11] Those exceptions are limited to: (i) property acquired by gift, bequest, devise or descent; (ii) property acquired in exchange for such property or property acquired prior to marriage; (iii) property acquired after decree of legal separation; (iv) property specifically excluded by valid agreement; or (v) the increase in value of property acquired before marriage, where such increase did not result from the active efforts of the parties during marriage.[12]

RSUs are "a form of equity-based compensation under which the issuer company promises to deliver whole shares of stock of the company in the future to an employee at no cost to the employee, if pre-specified vesting and distribution conditions are satisfied."[13] Vesting conditions generally tie the employee's compensation either to a performance metric or time of service

---

[10] *Travis v. Travis*, 59 S.W.3d 904, 909 n.6 (Ky. 2001).

[11] KRS 403.190(3).

[12] KRS 403.190(2).

[13] Michael J. Halloran, et al., VENTURE CAPITAL & PUBLIC OFFERING NEGOTIATION, Ch. 15 § 7 (3d ed. 2020) (hereafter VCPON); *see also In re Marriage of Micheli*, 15 N.E.3d 512, 521 (Ill. App. Ct. 2014) ("RSUs are a form of deferred compensation paid in stock that upon the expiration of any restrictions become fully tradable common stock.").

metric.[14] Unvested restricted stock units generally are not transferable.[15] States are divided on how to classify such assets in a divorce.[16]

Laura analogizes the RSUs in question to the contingency fee contract at issue in this Court's recent *Grasch* opinion.[17] We note that *Grasch* was rendered after completion of the trial court's consideration of this case and submission of briefs to the Court of Appeals, so the lower courts did not have the benefit of this Court's opinion in that case as guidance. In *Grasch*, the parties contested the appropriate classification of an attorney's contingency fee contract entered into during the marriage, but did not become payable until after the divorce.[18] We held that a contingency fee contract constitutes marital property and is subject to division in a dissolution proceeding.[19] We stated that such division was limited to the proportion of the work performed before the

---

[14] *Id.*

[15] EXECUTIVE COMPENSATION § 2715 (Wolters Kluewer, 2018 WL 2447699).

[16] *See Schiavone v. Schiavone*, No. 314058, 2014 WL 1401686, at *4 (Mich. Ct. App. Apr. 10, 2014) (Defendant's restricted stock options that vested after the divorce were not earned during the marriage.); *Walsh v. Walsh*, No. A-4046-03T2, 2006 WL 2315846, at *8 (N.J. Super. Ct. App. Div. Aug. 11, 2006) (holding subject RSUs were not vested prior to the petition for dissolution and therefore not subject to equitable distribution); 750 Ill. Comp. Stat. Ann. 5/503 (2019) ("[A]ll stock options and restricted stock…granted to either spouse after the marriage and before a judgment of dissolution of marriage or legal separation or declaration of invalidity of marriage, whether vested or non-vested or whether their value is ascertainable, are presumed to be marital property."); *In re Marriage of Hug*, 201 Cal. Rptr. 676, 678 (Cal. Ct. App. 1984) (established a ratio of marital to nonmarital for unvested assets as the number of months employed by the grantor while married divided by the total number of months employed upon vesting); *Wendt v. Wendt*, 757 A.2d 1225 (Con. App. Ct. 2000) (RSUs are divisible as marital property based on time between grant and separation.).

[17] *Grasch v. Grasch,* 536 S.W.3d 191 (Ky. 2017).

[18] *Id.* at 192.

[19] *Id.* at 194-95.

9

dissolution, and the indeterminate value of the asset made it particularly suitable for delayed division.[20] This holding is consistent with prior Kentucky opinions and many of those in other states regarding unvested assets with uncertain values.[21]

In addressing the appropriate division, Laura argues that the RSUs themselves represent wages as of the date of the grant, making them entirely marital property. In support of this proposition she relies on the Court of Appeals' affirmation of the trial court in *Penner v. Penner*.[22] In *Penner*, the trial court classified the husband's Humana RSUs as marital property at time of grant, equally dividing the unvested shares.[23] Similarly, in *Dotson v. Dotson*, the Court of Appeals affirmed a trial court's division of the wife's United Parcel Service Restricted Performance Units (RPUs) as marital property, holding that her right to participate in the program accrued during the marriage even though the value was unvested.[24] Laura argues that Scott's right to participate

---

[20] *Id.* at 195.

[21] *See McGinnis v. McGinnis*, 920 S.W.2d 68 (Ky. App. 1995) (holding nonvested shares of stock as marital property); *Poe v. Poe*, 711 S.W.2d 849 (Ky. App. 1986) (holding nonvested military pension to be marital property); *In re Marriage of Short*, 890 P.2d 12, 13 (Wash. 1995) (Unvested stock options were part community property and part separate property.); *but see In re Marriage of Miller*, 915 P.2d 1314 (Colo. 1996) (Shares of restricted stock granted during marriage constituted marital property in their entirety.).

[22] 411 S.W.3d 775 (Ky. App. 2013).

[23] *Id.* at 778. (*Penner* was remanded by the Court of Appeals because in addition to dividing the interest in the RSUs, the trial court attributed 100% of the value to the noncustodial parent for purposes of child support and maintenance, finding this to be "double dipping.")

[24] 523 S.W.3d 441, 445 (Ky. App. 2017). It should be noted that while similar, RSUs and RPUs have significant technical differences. RPUs are transferred to an

10

was based on his work performance during marriage and was marital property upon grant. This is directly contrary to *Grasch*, where we acknowledged that signing the contingency contract was only the necessary, first step in receiving the compensation.

Scott argues the trial court and Court of Appeals were correct in classifying the RSUs as nonmarital, that they represented a "mere expectancy" with no value to divide prior to the vesting date. He argues *Grasch* must be read consistently with this Court's opinion in *Holman v. Holman.*[25] In *Holman*, the husband was the recipient of a disability pension as the result of an on-the-job injury as a firefighter.[26] This Court held that whether such benefits were marital or nonmarital was determined by the character of the property they replaced.[27] We held that "income earned, or payments made…to replace income earned post-divorce are nonmarital."[28] The proper classification of these types of assets requires a careful case-by-case analysis of the employee compensation agreement or other agreement granting them. In this case, Scott argues that the RSUs are nonmarital as income earned after the dissolution of

---

employee's account upon grant but must be returned if for any reason they do not vest. Employees may not trade the shares represented by the RPUs between grant and vesting but do receive voting rights and dividends during the restricted period. RSUs are not added to an employee's account until vesting and the employee receives no dividend income or voting rights until vested.

[25] 84 S.W.3d 903 (Ky. 2002).

[26] *Id.* at 904.

[27] *Id.*

[28] *Id.* at 910.

the marriage and therefore not part of the marital estate,[29] comparing them to the debt relief afforded a broker in *Cobane v. Cobane*.[30]

In *Cobane,* the husband was paid $967,243 as part of a transition incentive program.[31] Attached to the payment were promissory notes incrementally forgiven over a period of nine years.[32] At the time of divorce, approximately $426,000 of the attached promissory notes remained outstanding.[33] The trial court found that all of the funds already forgiven as well as 65% of the outstanding balance were marital property.[34] The Court of Appeals reversed, holding that the encumbered funds were "more akin to unearned future income than an unvested benefit."[35] As such, the prepaid compensation was nonmarital as to the portion still attached to unforgiven promissory notes as of the date of the divorce decree.[36]

Scott argues that like unforgiven debt in *Cobane*, he only earns the income upon the vesting of the RSUs because they are fully subject to forfeit prior to that point. We do not find this argument persuasive because, under this reading, one would have to believe that the only performance required to

---

[29] *Sharber v. Sharber*, 35 S.W.3d 841, 844-45 (Ky. App. 2001).

[30] 544 S.W.3d 672 (Ky. App. 2018).

[31] *Id.* at 676.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* at 678.

[36] *Id.*

earn the RSUs was given on the day of vesting. We find the grant of RSUs to be more analogous to the contingency fee contract in *Grasch* than *Cobane's* debt relief. And as we stated in *Grasch*, assets like the contingency fee contract, or Scott's RSUs, may represent both marital and nonmarital property.[37] To appropriately classify such assets, the trial court must first determine whether, and to what extent, they were granted as compensation for service prior to the grant versus as an incentive for the employee's future services.[38]

Like the contingency fee contract, the RSU grants were contracted for during the marriage but required Scott's continued employment for a period of time before they would be paid out. Also like the contingency fee contract, Scott would either receive the entire value of the RSUs or nothing. As we stated in *Grasch*, assets like the contingency fee contract, or Scott's RSUs, may represent both marital and nonmarital property.[39] "[T]he consideration critical to the issue of distribution is the extent to which the anticipated benefits will have been generated by the mutual effort of the parties."[40]

We decide, as a default rule, that RSUs are "earned" over the period between grant and vesting.[41] This methodology is consistent with KRS 403.190,

---

[37] 536 S.W.3d at 195. *See also Dejesus v. Dejesus*, 687 N.E.2d 36, 41 (N.Y. 1997).

[38] *See* Barth H. Goldberg, VALUATION OF DIVORCE ASSETS § 7:8 (Rev. Ed. 2019).

[39] 536 S.W.3d at 195. *See also Dejesus v. Dejesus*, 687 N.E.2d 36, 41 (N.Y. 1997).

[40] *Id.* at 193.

[41] This rule is similar to the rule first articulated in the case of *In re Marriage of Nelson*, 222 Cal. Rptr. 790 (Cal. Ct. App. 1986). The *Nelson* test limits the consideration to the period between grant and vesting, with a corresponding marital

13

in that the proportion of the RSUs "acquired" for purposes of marital classification is the proportion of time between grant and decree of separation that is marital.[42] This is also consistent with our reasoning in *Grasch* wherein we stated, "[w]hile the attorney spouse may put forth work, for the benefit of the marriage, on the contingent-fee case itself, the non-attorney spouse, through that spouse's work and efforts elsewhere for the benefit of the marriage, anticipates receipt of the benefits resulting from the attorney spouse's work on that case."[43] Parties may overcome the presumption that the grants represent compensation for employment during the vesting period by offering contrary evidence. Such evidence may include, but is not limited to, appropriate plan documents such as Securities and Exchange Commission filings, plan prospectus, or grant documents.

Turning to Scott's Humana Stock Incentive plan, both parties testified that the RSUs were generally awarded in February of a given year, vesting three years later. The value of the RSUs was reported as ordinary income on Scott's W-2 in the year of vesting and appropriately taxed at that time. Scott testified

---

allocation calculated by the number of months married during vesting period divided by the total vesting period. Courts applying the *Nelson* formula tend to view the compensation in question as compensation for employment during the vesting period or as a retention tool by the grantor. Past performance may have made the employee eligible to receive the grant, but the grant's purpose was to ensure continued employment for a reasonable period after the grant.

[42] *See* Brett R. Turner, EQUITABLE DISTRIBUTION OF PROPERTY § 5:22 (4th Ed. 2019) (Payments received under an employment contract are acquired when the employee performs the required services for the employer, and not when the contract is signed.).

[43] 536 S.W.3d at 194.

14

that the grants were a means of hiring and retention for Humana. Based on these facts, we find no reason to disturb our general rule that the RSUs are a form of deferred compensation representing payment for services over the three-year vesting period. As such, the marital portion of each RSU allotment would be the proportion of time in each three-year vesting period that was marital. However, because the parties did not have the benefit of knowing this presumption, the parties should be allowed to offer evidence to rebut the presumption and the proportion in which the RSUs are "earned." We therefore reverse and remand for appropriate classification of Scott's 2013, 2014, and 2015 RSUs consistent with this Opinion.

We note that appropriate classification as nonmarital or marital property is only the first step. The trial court must then assign any nonmarital property to the appropriate party before finally exercising its judgment in equitably dividing the marital property.[44] KRS 403.190 outlines principal factors to be considered, but the court should include other relevant factors. For instance, RSUs, unlike plans regulated under the Employee Retirement Income Security Act (ERISA), may not qualify for division via a Qualified Domestic Relations Order (QDRO) resulting in adverse tax consequences if immediately divided.[45] Deferred compensation arrangements are generally taxed fully to the earning

---

[44] *Sexton v. Sexton*, 125 S.W.3d 258, 265 (Ky. 2004).

[45] Brett R. Turner, 18 No. 1 Divorce Litig. 1 (January 2006). *See also Atkisson v. Atkisson*, 298 S.W.3d 858, 867 (Ky. App. 2009) ("Trial court should consider the tax consequences of its division of marital property.").

15

employee, so any division must consider the tax paid and expenses incurred by the RSU owner in liquidating the RSUs.[46] The RSUs in this case have already vested so it should be relatively easy for the parties to determine the after-tax value received, but courts in future cases should consider orders for delayed division upon vesting due to the uncertain value the RSUs represent. Accordingly, on remand the trial court must classify the RSUs as marital or nonmarital, and then equitably divide the marital portion.

## B. The Trial Court erred by not considering bonuses and RSUs in its award of child support.

Laura contends the trial court abused its discretion by failing to adjust upward the child support from the top of the statutory guidelines. The review of an award of child support is for an abuse of discretion.[47] Typically a court calculates the parents' combined monthly adjusted gross income and determines the appropriate child support obligation amount from the guidelines table.[48] However, the guidelines top out at $15,000 in combined monthly income; therefore, KRS 403.212(5) provides: "[t]he court may use its judicial discretion in determining child support in circumstances where combined adjusted parental gross income exceeds the uppermost levels of the guideline table." In the instant case, we have two issues to address. First, did

---

[46] Charles P. Kindregan, Jr. and Patricia A. Kindregan, *Unexercised Stock Options and Marital Dissolution*, Suffolk U.L. Rev. 227, 238 (2001); *see also* Brett R. Turner, EQUITABLE DISTRIBUTION OF PROPERTY § 5:22 (4th ed. 2019).

[47] *McCarty v. Faried*, 499 S.W.3d 266, 271 (Ky. 2016) (citing *Plattner v. Plattner*, 228 S.W.3d 577, 579 (Ky. App. 2007)).

[48] KRS 403.212(2)–(7).

the trial court correctly calculate the combined monthly adjusted gross income at $19,894? And second, if it did, was its decision to set support at $2,199 per month an abuse of discretion?

For purposes of child support, income is defined as "actual gross income of the parent if employed to full capacity or potential income if unemployed or underemployed."[49] KRS 403.212(2)(b) goes on to state:

> "Gross income" includes income from any source, ***except as excluded*** in this subsection, and includes but is not limited to income from salaries, ***wages***, retirement and pension funds, commissions, ***bonuses***, dividends, severance pay, pensions, interest, trust income, annuities, ***capital gains***, Social Security benefits, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, Supplemental Security Income (SSI), gifts, prizes, and alimony or maintenance received. Specifically excluded are benefits received from means-tested public assistance programs, including but not limited to public assistance as defined under Title IV-A of the Federal Social Security Act1, and food stamps.

(Emphasis added). The trial court considered only his base salary when setting Scott's income as $18,841 per month. Finding that this exceeded the maximum contained in support guidelines, it then chose to dispense with consideration of the RSUs given their indeterminate nature.

In making child support determinations, courts must consider all income proven by substantial evidence.[50] The party seeking to use a different income level bears the burden of showing that such future earnings will not be

---

[49] KRS 403.212(2)(a).

[50] *Bootes v. Bootes*, 470 S.W.3d 351, 355 (Ky. App. 2015).

consistent with their recent experience.[51] While *Layman v. Bohanon,* provides the trial court some allowance for adjusting the parties' anticipated income, such adjustments must be supported by evidence.[52] Here, Scott testified to a possible merger between Humana and another healthcare insurance provider as the only reason to support a deviation. Such testimony was speculative and even if true, unlikely to alter Scott's near-term prospects.

In *Penner*, a case to which both parties cite, the Court of Appeals reviewed a similar issue where the trial court decided directly opposite to this trial court regarding questions of unvested income. The trial court in *Penner* divided the unvested equity as marital property and included 100% of the value in the employee-spouse's income for purposes of maintenance and support.[53] The Court of Appeals said this was "double dipping" on the part of the non-employee spouse and the trial court abused its discretion by applying the income in this manner.[54] Based on our holding in III(A) above, the RSUs should have been treated as deferred marital income and said income should have been added proportionally to each spouses' gross monthly income in determining child support. The trial court erred in failing to do so. Had the trial court calculated the parties' income properly, their combined monthly income would have approximately doubled and should have compelled the court to

---

[51] *Layman v. Bohanon,* 599 S.W.3d 423, 434 (Ky. 2020) (citing *Keplinger v. Keplinger,* 839 S.W.2d 566, 569 (Ky. App. 1992)).

[52] *Id.*

[53] 411 S.W.3d at 781.

[54] *Id.*

adjust upwards from the child support guidelines. We recognize applying the RSUs in this manner is likely to skew the relative proportion of the monthly gross income in a way that is not representative of the actual earning power of the parties, but the trial court has discretion to take this into consideration when ordering child support.

In any support determination, KRS 403.211(3) and 403.212(5) give the court broad discretion when the combined parental gross income exceeds the upper limit.[55] We said in *McCarty v. Faried* that when setting the support above the guidelines, the trial court's determination must be in the best interests of the child.[56] "When making that determination, a trial court may use its judicial discretion with regard to weighing the factors such as: the needs of the child, the financial circumstances of the parents, and the reasonable lifestyle the child may have been accustomed to before or after the parents separated."[57] Child support determinations must be supported by appropriate written

---

[55] *Seeger v. Lanham,* 542 S.W.3d 286, 298 (Ky. 2018) (The statutory factors to be considered are merely representative and not exhaustive.); *C.D.G. v. N.J.S.,* 469 S.W.3d 413, 418 (Ky. 2015) ("[T]he courts of this Commonwealth have repeatedly stated, trial courts have broad discretion in determining child-support matters."); *see also McIntosh v. Landrum*, 377 S.W.3d 574, 577 (Ky. App. 2012) ("Trial court retains considerable discretion over the establishment or modification of child support; however, that discretion is not unlimited, but the Legislature has created general guidelines and presumptions, which the trial court may only deviate from if it gives appropriate written reasons.") (quoting *Com. Ex rel. Marshall v. Marshall*, 15 S.W.3d 396, 400-01) (Ky. App. 2000); *Brown v. Brown*, 952 S.W.2d 707 (Ky. App. 1997) (Courts have flexibility to fashion appropriate child support orders for situation not addressed by statutory scheme.).

[56] 499 S.W.3d 266, 273 (Ky. 2016).

[57] *Id.*

19

reasons based on specific facts and circumstances and not merely on simple mathematical extrapolation from the guidelines.[58] As we have noted, the combined gross monthly income captures all sources of income available to the parties including bonuses, RSUs, and maintenance.[59] Therefore, it is clear the RSU income should have been included in the income calculation, and the trial court erred in not doing so. For this reason, we reverse the trial court's child support calculation. On remand the trial court must appropriately allocate the RSUs to the parties then recompute the child support weighing all the ordinary, relevant factors addressed in such a support award including "the reasonable lifestyle the child may have been accustomed to."[60] In doing so, the court can consider whether its previous order that the parties equally split the costs of the children's extracurricular activities is still appropriate.

Lastly, we note the problematic nature of the current guidelines. The current income tables are in need of updating by the legislature, both to capture a greater range of incomes and ensure the support allocations in the table remain both realistic and appropriate. Until then, it is incumbent upon the courts to use their discretion in assessing the relevant factors when addressing incomes not explicitly covered by the table and in deciding on departures from the guidelines' recommendations in light of the parties' circumstances.

---

[58] *Downing*, 45 S.W.3d at 457 (reversing lower court's strict reliance on a linear extrapolation of support unwarranted by any evidence of actual need).

[59] KRS 403.212(2)(b).

[60] *McCarty*, 499 S.W.3d at 273; *see also* KRS 403.211(5).

20

**C. The trial court did not abuse its discretion in its award of maintenance.**

Laura challenges the maintenance award of $1,500 per month for forty-eight months. The statutory test for granting maintenance is whether the spouse is unable to support her own reasonable needs through her property, including her part of the marital estate, and is also unable to support herself through suitable employment.[61] Once a court deems an award of maintenance to be proper, the statute directs:

> (2) The maintenance order shall be in such amounts and for such periods of time as the court deems just, and after considering all relevant factors including:
>
> (a) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
>
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
>
> (c) The standard of living established during the marriage;
>
> (d) The duration of the marriage;
>
> (e) The age, and the physical and emotional condition of the spouse seeking maintenance; and
>
> (f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.[62]

---

[61] KRS 403.200(1).

[62] KRS 403.200(2).

Under the statute, the trial court's responsibilities are to make relevant findings of fact and exercise its discretion in the determination of appropriate maintenance in light of those facts.[63]

Laura proposed a budget identifying her reasonable needs as $9,000 per month. After review, the Oldham Family Court found her reasonable needs were actually $6,000 per month. While Laura was not currently employed, the trial court found she was capable of earning at least $1,733 per month and had personal property (nonmarital and her share of marital property) valued at approximately $700,000. The trial court acknowledged that the couple had lived a relatively lavish lifestyle and been married for twelve years, two of which were during the pendency of the divorce. The trial court noted that prior to marriage, Laura had earned a significantly higher salary than the imputed number, but she would be required to update her educational and licensing background to resume that level of employment. Based on these facts, she had a monthly shortfall of $4,267 between her reasonable needs and imputed income which must be serviced by a combination of maintenance and Laura's personal assets.[64]

Laura principally relies on our opinion in *Powell v. Powell*, 107 S.W.3d 222 (Ky. 2003), where we reversed the trial court's maintenance obligations as

---

[63] *Perrine v. Christine*, 833 S.W.2d 825, 826 (Ky. 1992).

[64] It should be noted in the divorce decree, the trial court incorrectly calculated the shortfall as $3,267 per month. The calculation was corrected in its order regarding the parties' motions to alter, amend or vacate. Following the correction, the court did not adjust the maintenance award.

insufficient. In *Powell,* the couple was married eighteen years with a combined income of nearly $600,000 annually, entirely from the husband's neurosurgery practice.[65] The trial court awarded the wife $3,000 per month in maintenance for three years.[66] The wife had proposed a budget establishing her reasonable needs at $5,400 per month.[67] A plurality, writing for the court, remanded the case in part because the trial court failed to address the gross discrepancy in incomes between parties and for a lack of analysis as to what the wife's reasonable needs were in light of the couple's standard of living.[68] A two-vote concurrence accepted the wife's proposed budget as sufficient evidence of reasonable need, but found the trial court failed to adequately analyze the wife's ability to meet that reasonable need independently and remanded for that reason.[69]

Laura postulates that like *Powell,* the trial court failed to adequately calculate her reasonable monthly needs. Furthermore, she argues the trial court never considered that Scott's income was more than adequate to support the higher amount of maintenance requested. Finally, she advances that if her independent assets are to be considered as a source for the shortfall, the trial

---

[65] *Id.* at 223-24.

[66] *Id.* at 223 (The wife had been a registered nurse, and the trial court found three years to be a reasonable timeframe to allow her to renew her licenses and meet any new educational requirements.).

[67] *Id.* at 227.

[68] *Id.* at 225.

[69] *Id.* at 227.

court must make a specific finding as to the reasonable income imputed to those assets, seemingly arguing that the principal of the assets is beyond the court's consideration.

Scott relies principally on this Court's decision in *Perrine v. Christine*, where the couple was married for thirty-four years living on the husband's annual income of $151,000.[70] Upon dissolution, the couple essentially divided all assets fifty-fifty including numerous investments, property, and the husband's deferred compensation and pension benefits totaling approximately $600,000.[71] The trial court found the wife's reasonable needs were $46,000 per year and found that the division of marital property was sufficient to meet that need.[72] We held that the trial court was not clearly erroneous in eliminating the temporary maintenance in light of the assets available to the wife to meet her needs.[73] We stated, "[l]ike anyone else with financial responsibilities and limitations, [the wife] may decide whether and when liquidation, and what investment strategy, is in her best interest. The trial court need only decide whether the party seeking maintenance has available sufficient resources to meet the conditions of KRS 403.200."[74]

---

[70] 833 S.W.2d at 825.

[71] *Id.* at 826.

[72] *Id.*

[73] *Id.* at 827.

[74] *Id.*

Applying the abuse of discretion standard, we hold the trial court's decision was not arbitrary, unreasonable, unfair, or unsupported by legal principles. The trial court is not required to delineate every factor, but only to consider the factors in its decision.[75] Like the trial court in *Perrine*, the trial court here rightly considered Laura's independent assets, whether as an income source or through principal liquidation, in determining Laura's ability to support herself. Such considerations do not require the court to undertake the work of an investment advisor, only to make reasonable conclusions based on the facts presented as to the adequacy of those resources. The trial court addressed Laura's inability to immediately return to the job market at her previous level. Unlike the trial court in *Powell*, the Oldham Family Court made specific, if not budget level, findings regarding Laura's proposed monthly needs.

Consideration of the lifestyle to which Laura had become accustomed during the marriage is captured in KRS 402.200(2)(c) separately from Scott's ability to pay. As the Court of Appeals correctly noted, "the trial court is not required to analyze [Scott's] income when it calculated [Laura's] maintenance payment...only to consider his ability to provide for himself and make the payments ordered."[76] The ability to pay is not an independent plus factor in the award of maintenance, unlike the similar provisions in Kentucky's child

---

[75] *Shafizadeh v. Shafizadeh*, 444 S.W.3d 437, 446 (Ky. App. 2012) (citing *McGregor v. McGregor*, 334 S.W.3d 113, 118 (Ky. App. 2011)).

[76] *Normandin v. Normandin*, No. 2016-CA-000392-MR, 2018 WL 2450534, at *4 (Ky. App. June 1, 2018).

support statutes. In KRS 403.211(3) and 403.212(5), excess income above guidelines is an independent factor supporting an upward departure from the support guidelines. KRS 403.200(2)(f), on the other hand, operates as an equity check, allowing courts to determine whether the resulting maintenance calculations based on the reasonable needs of the dependent spouse can be adequately served by the paying spouse while meeting his or her own needs. Courts may disagree as to what constitutes the reasonable needs of a lower wage-earning spouse in high income divorces where the couple maintained an extravagant lifestyle, but we cannot find the trial court abused its discretion. For these reasons, we find no abuse of discretion by the trial court and affirm the Court of Appeals as to maintenance.

## D. The issues of classification of the Wyoming property and Scott's 401k are not properly before the Court.

Laura raises two issues in her brief that were not addressed in her motion for discretionary review: (i) the trial court's classification of the Wyoming property; and (ii) the nonmarital allocation of Scott's 401k. Although fully briefed, these issues are not properly before the Court pursuant to Kentucky Rules of Civil Procedure 76.20(3)(d). Consistent with prior holdings, this Court will not address issues which the Appellant fails to raise in the Motion for Discretionary Review.[77]

---

[77] *See Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 41 (Ky. 2017); *Wells v. Commonwealth*, 206 S.W.3d 332, 335 (Ky. 2006); *Ellison v. R & B Contracting, Inc.,* 32 S.W.3d 66, 71 (Ky. 2000).

## IV. CONCLUSION

In conclusion, we hold that the Oldham Family Court improperly classified Scott's restricted stock units and, due to the nature of the restricted stock units, miscalculated the combined monthly income for purposes of setting child support. We also hold the Oldham Family Court did not abuse its discretion by not considering Scott's income as an independent factor for increasing the directed maintenance or computing Laura's reasonable needs.

For the foregoing reasons, we affirm the Court of Appeals on the question of maintenance but reverse on the issues of the marital division of the restricted stock units and resulting child support calculation and remand for further proceedings consistent with this Opinion.

Minton, C.J; Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. All concur. Nickell, J., not sitting.

COUNSEL FOR APPELLANT:

Paul Joseph Hershberg
Paul Hershberg Law, PLLC

Louis Paz Winner
Clay Daniel Winner LLC

COUNSEL FOR APPELLEE:

James Daniel Theiss
James L. Theiss
Theiss Law Offices PLLC